## SERVICE OF SUMMONS AND COMPLAINT COVER SHEET

DOCUMENT(S) SERVED: Summons & Complaint_____

NAME OF PERSON ACCEPTING SERVICE: Emily Getty_____

CASE NAME/PARTIES: Priscilla Roberson v. Metro Transit and Metropolitan Council_____

DATE/TIME SERVICE WAS ACCEPTED: 12/18/18  2:50pm_____

LOCATION SERVICE WAS ACCEPTED: Robert St_____

SERVED BY:   ☒ PERSONAL SERVICE   ☐ U.S. MAIL

IF PERSONALLY SERVED, BY:

☒ COURIER   ☐ SHERIFF   ☐ U.S. MARSHALL   ☐ OTHER

BY LAW, WE ARE <u>REQUIRED</u> TO RESPOND TO A SUMMONS AND COMPLAINT SERVED UPON THE METROPOLITAN COUNCIL WITHIN 20 CALENDAR DAYS AFTER THE DATE OF SERVICE.  PLEASE ATTACH TO THIS COVER SHEET ALL DOCUMENTS SERVED UPON YOU AND ROUTE THIS COVER SHEET AND THE ATTACHED DOCUMENTS ASAP TO OFFICE OF GENERAL COUNSEL, 390 N. ROBERT STREET, SAINT PAUL.

ONLY SPECIFICALLY DESIGNATED COUNCIL EMPLOYEES ARE AUTHORIZED TO ACCEPT SERVICE OF PROCESS ON BEHALF OF THE COUNCIL.

IF YOU HAVE QUESTIONS OR NEED ASSISTANCE, PLEASE CALL THE OFFICE OF THE GENERAL COUNSEL AT EXTENSIONS 1463 OR 1751.  THANK YOU FOR YOUR COOPERATION.

# GILBERT ALDEN
ATTORNEYS | ADVOCATES

Charlie R. Alden
Matthew J. Gilbert

Beth W. Barbosa
Adam J. Almen

December 12, 2018

Metro Transit
560 Sixth Avenue North
Minneapolis, MN 55411

**VIA PERSONAL SERVICE**

Re:    *Priscilla Roberson v. Metro Transit and Metropolitan Council*
      **Court File No. TBD**

Dear Metro Transit:

Enclosed and served upon you via personal service, please find a Summons and Complaint in connection with the above-referenced matter.

Sincerely,

/s/ Charlie Alden

Charlie R. Alden

**GILBERT ALDEN PLLC**

CRA:js

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Court File No.: _____
Case Type:   Employment

Priscilla Roberson,

　　　　　Plaintiffs,

v.

Metro Transit and Metropolitan Council,

　　　　　Defendants.

**SUMMONS**

**To:**

1.　　Metropolitan Council, 390 Robert St. North, St. Paul, MN 55101-1805

2.　　Metro Transit, 560 Sixth Avenue North, Minneapolis, MN 55411

　　1. **YOU ARE BEING SUED.** The Plaintiffs have started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

　　2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

**GILBERT ALDEN PLLC**

Charlie R. Alden, Reg. No. 0389896
2801 Cliff Rd E
Suite 200
Burnsville, MN 55337
612-990-2484 l Office & Cell
612-806-0585 l Fax

1

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the Complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: December 12, 2018            **GILBERT ALDEN PPLC**


By: _/s/ Charlie R. Alden_
        Charlie R. Alden, Reg. No. 0389896
        2801 Cliff Rd E
        Suite 200
        Burnsville, MN 55337
        Charlie@GilbertAlden.com
        612-990-2484 | Office & Cell
        612-806-0585 | Fax

**ATTORNEYS FOR PLAINTIFFS**

## <u>ACKNOWLEDGMENT</u>

That costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.21 to the party against whom the allegations in this pleading are asserted.

Dated this 12th day of December, 2018

/s/ Charlie R. Alden
Charlie R. Alden

3

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Court File No.: _____
Case Type:    Employment

Priscilla Roberson,

                              Plaintiffs,

v.

Metro Transit and Metropolitan Council,

                              Defendants.

**COMPLAINT**
**JURY TRIAL DEMANDED**

## PARTIES

1.      Plaintiff Priscilla Roberson ("Roberson") is a natural person who resides in the County of Hennepin, State of Minnesota.

2.      Defendant Metropolitan Council is a public corporation and political subdivision of the state that owns and operates Metro Transit.

3.      Defendant Metro Transit is an operating division of the Metropolitan Council.

4.      Metro Transit provides bus service throughout the Twin Cities metropolitan area.

5.      At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of 29 U.S.C. § 2611.

6.      At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minn. Stats. § 363A.03 and 176.82.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over this matter and venue is appropriate in this district because the cause of action arose in this county.

## FACTUAL BACKGROUND

8.    Ms. Roberson was hired by Metro Transit ("Metro") as a bus driver on or about January 30, 2017 on a six-month probationary period.

9.    Mr. Roberson had just moved to Minnesota and for a period of time during the probationary period, became homeless, which caused her to be unable to complete the probationary period.

10.    She was rehired on September 7, 2017 and placed on a Last Chance Agreement. Pursuant to the Last Chance Agreement, Ms. Roberson agreed that within a rolling 12-month period, effective with her reinstatement, she could not exceed six occurrences of absenteeism and could not exceed one late occurrence.

11.    On April 14, 2018, Ms. Roberson was walking toward her bus when she slipped on the snow. She landed on her hip and hit the back of her head on the ground.

12.    She reported to the emergency room the same day experiencing headaches, dizziness, and memory loss. She was diagnosed with having suffered a concussion. Her injury was a work related injury and as such she made a first report of injury and received workers compensation.

13.    Ms. Roberson was referred to Metro's Occupational Health Department ("Occupational Health") on May 4, 2018. Occupational Health determined that Ms. Roberson was able to return to work with limitations beginning on May 4, 2018, with those restrictions clearing on a date "To Be Determined." The

occupational therapist wrote under the Comments section, "No bus driving —
needs further medical evaluation clearance."

14.     Ms. Roberson returned to work on May 4. She met with her supervisor
named Al Selser and asked what jobs were available that did not require driving.

15.     Ms. Roberson has 13 years of experience in the bus driving industry. She
is a certified CDL classroom instructor, and could have worked at the Metro
Instruction Center, training other bus drivers.

16.     When she applied for the job at Metro, Ms. Roberson submitted a resume
that showed all of her experience, and as such, Metro was aware of the other jobs
she could have performed.

17.     Ms. Roberson is also certified and experienced as a maintenance assistant
and could have worked in maintenance washing buses, cleaning, or doing
inventory.

18.     Ms. Roberson had also worked for a school bus company as a dispatcher,
and was qualified to do that job for Metro.

19.     Mr. Selser did not offer Ms. Roberson any of those jobs or inquire as to
what jobs she could perform.

20.     Instead, Mr. Selser sent Ms. Roberson home, telling her that he was
putting her on FMLA leave, and that she should get in touch with Metro when
she was cleared to work as a bus driver.

21.     Ms. Roberson received approval for continuous leave from April 14, 2018,
through May 31, 2018. Metro required that Ms. Roberson pass a fitness for duty
examination prior to resuming work.

22.    Plaintiff completed a fitness for duty examination on May 15, 2018, with a planned return to work date of May 17, 2018. On May 22, 2018, Metro updated her Continuous Leave request with a return to work date of May 17, 2018.

23.    On May 31, 2018, Plaintiff was seen by a Nurse Practitioner at Allina Health in Brooklyn Park for ongoing severe headaches. The Nurse provided Plaintiff with a return to work note. The Return to Work note stated "An Occupational Medicine referral will be placed to further facilitate additional work restrictions if necessary."

24.    On or around May 31, 2018, Ms. Roberson emailed, on request of her Manager Monica Kruger, the note to an individual named Jennifer Nelson in Metro's Human Resources office. In presenting the note to Ms. Nelson and discussing it, Ms. Roberson explained to Nelson that given her concussion symptoms, she was requesting accommodations in the form of sedentary work as a dispatcher or doing office work, or alternatively, a continuation of her FMLA leave so she could continue to recover from her concussion and attendant symptoms.

25.    Nelson told Ms. Roberson that her intermittent FMLA leave would be extended, that the required paperwork would be forthcoming, and that she would get back to Ms. Roberson regarding other jobs she could do at Metro.

26.    On June 4, 2018, Ms. Roberson was referred to a neurologist for ongoing headaches.

27.    Given that Ms. Roberson was still under a Last Chance Agreement, as she waited for what she thought was a forthcoming approval for intermittent leave or alternative job duties, she continued to go to work after being put back on the schedule, and from June 2 through June 15, Plaintiff worked 78.15 hours.

4

28.     On June 14, 2018, Metro provided Ms. Roberson with a form stating that her request for Continuous leave was approved for the time period April 14 through May 27, 2018. The form stated that Ms. Roberson's certification was "revised/extended through 5/27/18. Ongoing symptoms and doctor's visits following RTW from FFD Exam. If you have any ongoing absences for your condition beyond 5/27/18, you will need a FMLA packet completed."

29.     The purpose of the form appears to have been to indicate in Ms. Roberson's personnel file that she was cleared for the period of time she had already been off work. In the form, however, given its indication that Ms. Roberson had ongoing symptoms following her return to work and fitness for duty examination, Metro acknowledged that it was aware that Ms. Roberson continued to suffer from the effects of her injury and needed accommodations.

30.     On June 15, 2018, Ms. Roberson filled out another FMLA request for leave and provisional designation hoping that it would speed up the process. Metro, however, did not process the request within five days.

31.     From June 16 through June 29, as she continued to wait for confirmation from Metro that she could receive intermittent leave or receive alternative job duties, Ms. Roberson worked 82.76 hours. During this time, she continued to struggle with the symptoms of her concussion injury.

32.     On July 3, 2018, Ms. Roberson again saw her physician Rachael Long. Dr. Long filled out Ms. Roberson's Healthcare Provider Certification forms that were to be submitted to Metro's Occupational Health Department. She reported that since her April 14 fall, her leg pain had improved, but she had ongoing severe headaches, and other symptoms.

33.     The physician notes note that Dr. Long filled out Ms. Roberson's FMLA

paperwork at the appointment:

> Symptoms are consistent with likely concussion from her fall. I did
> give her another referral today to occupational medicine and also
> advised that she see a concussion specialist for her symptoms. She
> will continue to follow-up with her neurologist. Encouraged to tell
> the neurologist that her symptoms are improved with propronolol
> but she is having some side effects. I did complete her FMLA
> paperwork today stating that she will need ongoing appointments
> for her concussion and also will need to miss work at times
> potentially for severed headaches and other symptoms. She should
> follow-up with me as needed.

34.     In response to the question, "Is it medically necessary for the patient . . .

to be absent from work during the flare-ups?" Dr. Long checked "Yes" and

indicated that Ms. Roberson "May have severe headaches, dizziness, memory

loss." Dr. Long further indicated that based on her knowledge of Plaintiff's

medical condition, that approximately twice per month, for one day each

occurrence, Plaintiff was likely to have a flare-up that would require intermittent

FMLA use. Dr. Long also restricted Ms. Roberson to working 4 hours per day,

and indicated that her condition was likely to endure for one year following the

April 14, 2018 concussion. All of these documents were resubmitted, along with

the FMLA paperwork, to Human Resources Manager Deborah Aebi.

35.     Metro still had not responded to Ms. Roberson's request on May 31 for her

FMLA to be extended or for modified job duties. As such, on July 6, 2018, Ms.

Roberson wrote an email to Jennifer Nelson at Metro stating the following:

> Good morning Jennifer, my name is Priscilla Robertson driver
> #77036 at the Heywood garage I bel.ieve I spoke to you regarding
> my Fmla extention. I got a verbal approval from you but I never
> received the certification letter. Because of this I have been unfairly
> charged with absences whenever Im sick or have to see the doctor. I
> have nothing in writing to show my manager that my Fmla was
> extended. I've turned in all paperwork and doctor information but
> I have yet to see or hear back from anyone. Would you please get

back to me as soon as possible. I can be reached by email or at XXX-XXX-XXXX. Feel free to leave a message. Thanks for your time.

36.    Ms. Roberson received an out-of-office response to her email stating that she should write an email to Connie Devolder in Human Resources. As such, she wrote another email, this time to Connie Devolder, stating:

> Hello. My name is Priscilla Roberson drivrr [*sic*] 77036 and you are the third person I have reached out to about my FMLA extention [*sic*]. I've been waiting since the end of may for a response from someone and everyone continues to pass the buck. I've sent in all my paperwork and have done everything I am supposed to do but I continue to get charged with accurances [*sic*] for missing work due to illness or doctors appointments, all because no one will take the time out to send me my certification form to show I was given an extention [*sic*]. I got the extention [*sic*] verbally over the phone from someone whose name is [*sic*] forgot but I need the form to show management. Can you please reach back out to me as soon as you can. Thanks Priscilla Roberson

37.    From June 30 through July 13, 2018, Ms. Roberson continued to work 80 hours/week. Around July 9, Ms. Roberson spoke to Human Resources again about the status of her FMLA request, and in response, she was asked to submit yet a third FMLA packet, which she submitted to HR Manager Aebi through her manager Al Selser. She continued to call to HR nearly every day to determine the status of her three FMLA requests. She was never provided with any paperwork providing her with notice of her rights and responsibilities under the FMLA.

38.    On July 14, 2018, still not cleared for intermittent leave much less a reasonable accommodation that would not require driving, and as such, attempting to work through her disability, Ms. Roberson was scheduled to start a relief route (meeting another driver at a bus pickup location to take over their route).

39.    Ms. Roberson parked at the Metro garage on 7th and Olsen and swiped in to start her shift around 11:35 a.m. She swiped her badge to get the paddle

(which is the name given to the sheets of paper that describes the driver's route), and to tell dispatch that she had arrived for her shift. At this point, she was experiencing major flare-ups of her concussion symptoms that had begun that morning.

40.     After swiping in and getting the paddle, Ms. Roberson drove to the North Terminal, located at 4th and Nicollet, to park her car and walk to her relief location, on 7th and Nicollet.

41.     After parking her car, she started to walk the three blocks to 7th and Nicollet, and had plenty of time to walk the three blocks given that she had punched in and started walking at the same time that she always did, and it was enough time to get to the relief location.

42.     Midway through the walk, Ms. Robeson began to feel faint, lightheaded, dizzy, and confused. She slowed down and tried to collect herself, momentarily unclear of where she was or where she was going.

43.     She saw a Metro Transit supervisor sitting in his car and approached. She looked at him and appeared disoriented and confused. He looked at her asked what was wrong. Ms. Roberson asked for a ride, saying that she had five minutes to get to the relief location.

44.     The supervisor asked her what bus she was supposed to get on. Given her concussion symptoms, Ms. Roberson replied that she did not know. The supervisor called in to dispatch to determine what bus Ms. Roberson would be relieving.

45.     As Ms. Roberson stated in the transcript of her Investigative Hearing Summary, "I wanted to call in sick that day. It was a really bad day. Because of this mix up in HR, I felt like I had to work because of this last chance agreement."

8

46.    The supervisor drove Ms. Roberson the few extra blocks to her relief point. Ms. Robeson was only two minutes late, and she was able to get on the bus and take over the route. No driver has ever been charged with a late if they take over and drive their route. Ms. Roberson's non-black male counterparts have engaged in similar conduct and not been terminated.

47.    Given this was her second "late" occurrence under the Last Chance Agreement in a rolling 12-month period, Metro started an investigation regarding potential violation of the Last Chance Agreement.

48.    Metro held a preliminary hearing on July 17, and Ms. Roberson's Loudermill hearing on July 20, 2018. Following the Loudermill hearing, Ms. Roberson was placed on administrative leave but was still expected to be available for work between 8 a.m. and 4 p.m.

49.    Because Ms. Roberson continued to be employed but on administrative leave, Metro's Human Resources Department continued to process her FMLA request.

50.    According to an email written by Deborah Aebi, Senior Manager of Human Resources on July 19, "With respect to your FMLA request, it was submitted to our 3rd party vendor for designation on July 13. I will expedite resolution for you."

51.    When Ms. Roberson responded to the email "asking about information regarding my fmla which under the fmla act employers must be responsible to answer questions,"

52.    Ms. Aebi responded:

> There is minimal staff in Occupational Health given resignations that have recently occurred. I am responsible to designate FML leaves in accordance to policy.

We have contracted with a third party who is assisting us in meeting our obligations.

Your FML will be processed within 5 days of receipt.

53.    On July 23, 2018, Ms. Roberson received a form dated July 20, stating that Metro had finally processed her FMLA application, that she was approved for intermittent leave beginning on June 6, 2018, through December 6, 2018. She was approved for two episodes per month, each episode lasting 1 day. The form also stated, again, that she would not be able to work until she had completed a company fitness for duty examination.

54.    Because Metro had taken so long to process her request, Ms. Roberson was not cleared for intermittent leave, and as such, was not able to call in on July 14 to advise that due to a flare-up, she could not work that day.

55.    Plaintiff received her notice of termination on July 31, 2018, with an effective date of separation of August 1, 2018.

56.    Between May 25 and July 20, 2018, Ms. Roberson's phone records show that she called Human Resources thirty-nine times attempting to get an update on progress in granting her FMLA request and requests for work within her physical ability.

## CAUSES OF ACTION

## COUNT I – FMLA INTERFERENCE

57.    Plaintiff incorporates the foregoing paragraphs by reference as though fully stated herein.

58.    "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the

10

employer must notify the employee of the employee's eligibility to take FMLA leave within five business days." 29 C.F.R. § 825.300(b).

59.     Failure to follow the FMLA notice requirements may constitute an interference with FMLA rights. 29 C.F.R. § 825.300(e).

60.     Ms. Roberson advised Metro on multiple occasions prior to her termination on August 1, 2018 that she was requesting FMLA intermittent leave. Metro failed to advise Ms. Roberson of her eligibility for FMLA leave within five days. As a result, Ms. Roberson continued to attempt to show up for work, when she should have been on FMLA leave.

61.     Furthermore, pursuant to 29 C.F.R. § 825.300(d)(3), "If the employer will require the employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement with the designation notice." Metro did not provide the required designation notices within five days, and was also inconsistent and untimely in advising Ms. Roberson whether and when it would require her to undergo a fitness for duty test to return to work.

62.     29 C.F.R. § 825.300(e) provides that failure to follow the notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

63.     As a result of Metro's interference with Plaintiff's FMLA rights and failure to provide required notices, Plaintiff has been damaged in an amount in excess of $15,000, to be determined with certainty at trial.

## COUNT II – DISCRIMINATION BASED ON RACE AND SEX IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

64.    Plaintiff incorporates the foregoing paragraphs by reference as though fully stated herein.

65.    Plaintiff requested accommodations in the form of a job that was within her physical restrictions that did not require driving.

66.    Non-black male colleagues who were injured in the past and required accommodations had been provided with jobs within their physical limitations rather than being required to be off work and using FMLA leave.

67.    As a black female, Ms. Roberson was treated differently than non-black males who were injured at work but subsequently offered jobs within their physical restrictions.

68.    Ms. Roberson has been damaged as a result of Metro's discrimination based on her race and sex in an amount in excess of $15,000, to be determined with specificity at trial.

## COUNT III – REFUSAL TO OFFER CONTINUED EMPLOYMENT IN VIOLATION OF MINN. STAT. § 176.82 SUBD. 2

69.    Plaintiff incorporates the foregoing paragraphs by reference as though fully stated herein.

70.    Minn. Stat. § 176.82 provides that if an employee suffers a work injury, an employer must offer that employee continued employment if work is available within that employees physical limitations.

71.    Metro, rather than permitting Ms. Roberson to perform other duties that were within her physical limitations, sent her home and refused to offer her other non-driving employment.

12

72.    As a result of Metro's refusal to offer Ms. Roberson a position within her physical limitations, Ms. Roberson has been damaged in an amount in excess of $15,000, to be determined with specificity at trial.

WHEREFORE, Plaintiff Priscilla Roberson requests an order from the Court providing making the following findings and providing the following relief:

1.    Defendants discriminated against Ms. Roberson based on her race and sex in violation of the Minnesota Human Rights Act.

2.    Defendants refused to offer Ms. Roberson continued employment within her physical restrictions, when positions were available that she could have performed, in violation of Minn. Stat. § 176.82.

3.    Defendants interfered with Ms. Roberson's rights under the Family Medical Leave Act.

4.    Ms. Roberson is entitled to her costs, attorneys fees, and other penalties available by law, including liquidated damages under the FMLA, and treble damages under the MHRA, plus back-pay, front pay, and pre and post judgment interest.

5.    Any other relief afforded by law.

Dated: December 12, 2018        **GILBERT ALDEN PPLC**

By: /s/ Charlie R. Alden
    Charlie R. Alden, Reg. No. 0389896
    2801 Cliff Rd E
    Suite 200
    Burnsville, MN 55337
    Charlie@GilbertAlden.com
    612-990-2484 | Office & Cell
    612-806-0585 | Fax

**ATTORNEYS FOR PLAINTIFFS**

13

## ACKNOWLEDGMENT

That costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.21 to the party against whom the allegations in this pleading are asserted.

Dated this 12th day of December, 2018

_____/s/ Charlie R. Alden_____
Charlie R. Alden